UNITED STATES OF AMERICA ex rel.
GEORGE BELLEVUE; STATE OF ILLINOIS ex
rel. GEORGE BELLEVUE; and GEORGE
BELLEVUE, individually,

        Plaintiffs,

    v.

UNIVERSAL HEALTH SERVICES OF
HARTGROVE INC., d/b/a HARTGROVE
HOSPITAL,

        Defendant.

No. 11 C 5314

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

George Bellevue brings this action on behalf of the United States of America and the State of Illinois alleging that Universal Health Services of Hartgrove Inc. ("Hartgrove"), violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1)(A), (B), and the Illinois False Claims Act ("IFCA"), 740 ILCS 175/3(a)(1)(A), (B), when it submitted certain Medicaid reimbursement claims. *See* R. 1. Hartgrove has moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b), for lack of jurisdiction and failure to state a claim. R. 30. For the following reasons, Hartgrove's motion is granted.

## Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. "The standard of review for a Rule 12(b)(1)

motion to dismiss depends on the purpose of the motion." *Bolden v. Wells Fargo Bank, N.A.*, 2014 WL 6461690, at *2 (N.D. Ill. Nov. 18, 2014) (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 443-44 (7th Cir. 2009)). "If a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction (a facial challenge), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiffs favor." *Bolden*, 2014 WL 6461690, at *2 (citing *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003)). A factual challenge to the court's subject matter jurisdiction, on the other hand, is based on the assertion that "the complaint is formally sufficient but . . . there is *in fact* no subject matter jurisdiction." *United Phosphorus*, 322 F.3d at 946 (emphasis in original). When considering a factual challenge to the court's jurisdiction, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008). "Where jurisdiction is in question, the party asserting a right to a federal forum has the burden of proof, regardless of who raised the jurisdictional challenge." *Craig v. Ontario Corp.*, 543 F.3d 872, 876 (7th Cir. 2008).

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to

provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

Additionally, it is well-established that the FCA "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)." *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 998 (7th Cir. 2014). Rule 9(b) requires a "plaintiff to do more than the usual investigation before filing [a] complaint. Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (citations omitted). A complaint generally "must provide the

who, what, when, where and how" of the alleged fraud. *United States ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 740 (7th Cir. 2007).

## Background

Hartgrove is a psychiatric hospital that is enrolled with the Illinois Department of Healthcare and Family Services to receive reimbursement under the federal Medicaid program, which provides medical assistance for individuals and families with low incomes. R. 1 at 2 (¶ 5), 4-5 (¶ 15). Hartgrove's license with the Illinois Department of Public Health permits it to maintain 150 beds for acute mental illness patients. *Id.* at 5 (¶ 18). Prior to September 30, 2009, Hartgrove was approved to maintain 136 beds for acute mental illness patients. *Id.* (¶¶ 17-18). Hartgrove has attached letters to its motion dated March 23, 2009, and May 5, 2009, that the Illinois Department of Public Health sent to Hartgrove, informing Hartgrove that government audits had determined that Hartgrove had more patients than authorized beds (i.e., it was "over census") on at least 52 separate occasions between December 3, 2008 and February 28, 2009. *See* R. 39-3; R. 39-4.

Bellevue has been a Hartgrove employee since October 2009, and is currently employed there as a "nursing counselor." R. 1-1 at 2 (¶ 4). Bellevue alleges that Hartgrove actually maintains 152 beds for acute mental illness patients, even though it is only authorized to maintain 150 such beds. *Id.* at 5 (¶ 19). Additionally, Bellevue alleges that "some newly admitted adolescent patients suffering from acute mental illness [are] not placed into patient rooms, but instead [are] placed into dayrooms." *Id.* at 11 (¶ 42). These patients sleep on a "rollout bed . . . . until a

patient room becomes available." *Id.* at 12 (¶ 47). Bellevue provides 13 examples of patients who were treated this way between January 1, 2011 and June 3, 2011. *Id.* at 13-16 (¶¶ 52-64). Bellevue alleges that "[a]lthough these patients are not assigned a room, Hartgrove nevertheless submits a claim to Medicaid for inpatient care of the beneficiary, which essentially includes a patient room." *Id.* at 12 (¶ 49).

Bellevue alleges that "[w]henever a patient was admitted in excess of Hartgrove's capacity, Hartgrove was in violation of State laws, rules, and regulations." *Id.* at 12-13 (¶ 50). Specifically, Bellevue alleges that Hartgrove violated 77 Ill. Admin. Code § 250.230(b), which requires that a hospital shall ensure that its "occupancy does not at any time exceed capacity, except in the event of unusual emergency and then only as a temporary measure." *Id.* at 9-10 (¶ 36). Bellevue alleges that "[c]ompliance with these laws, rules, and regulations are material and a condition of payment." *Id.* at 12-13 (¶ 50).

Bellevue also alleges that in order to become a Medicaid provider in Illinois, Hartgrove has twice certified that it will comply with federal and state regulations. R. 1-1 at 6-8 (¶¶ 20-27). On April 8, 2004, Hartgrove signed a "Provider Enrollment Application." *Id.* at 6 (¶ 20); *see id.* at 41-42. By signing the "Provider Enrollment Application," Hartgrove certified that it understood "that knowingly falsifying or willfully withholding information may be cause for termination of participation in the Medical Assistance Program." *Id.* at 42. Hartgrove also certified that it was "in compliance with all applicable federal and state laws and regulations." *Id.*

On April 8, 2004, Hartgrove also signed an "Agreement for Participation in the Illinois Medical Assistance Program." *Id.* at 6 (¶ 20); *see id.* at 22-23. By signing the "Agreement for Participation," Hartgrove agreed "to comply with all current and future program policy provisions as set forth in the applicable Department of Public Aid Medical Assistance Program handbooks." *Id.* at 22 (¶ 1). Hartgrove also agreed "to comply with applicable licensing standards as contained in State laws or regulations." *Id.* (¶ 2). The "Agreement for Participation" provided that Hartgrove would "receive payment based on the Department's reimbursement rate," and that Hartgrove "agrees to be fully liable for the truth, accuracy and completeness of all claims submitted electronically or on hard copy to the Department for payment." *Id.* (¶¶ 6-7). Hartgrove also certified that "all services rendered on or after [the effective date of the agreement] were rendered in compliance with and subject to the terms and conditions of this agreement." *Id.* at 23 (¶ 17).

Bellevue alleges that by signing the "Agreement for Participation," Hartgrove also agreed to be bound by the terms of the Illinois Department of Healthcare and Family Service's "Handbook for Providers of Medical Services." *Id.* at 7-8 (¶¶ 26-27), 9 (¶ 31); *see id.* at 50-51. The Handbook provides the following:

> For consideration for payment by the Department under any of its authorized programs, covered services must be provided to an eligible participant by a medical provider enrolled for participation in the Illinois Medical Assistance Program. Services provided must be in full compliance with applicable federal and state laws . . . .

*Id.* at 51.

Additionally, Bellevue alleges that "[u]pon receipt of [Medicaid] payments, [Hartgrove] is required to sign and retain a billing certification which certifies that the services provided in the billing information were provided." *Id.* at 8 (¶ 29). Bellevue does not attach any of these "billing certifications," but he alleges that "[o]riginal billing certifications are in the possession of Hartgrove." *Id.* at 9 (¶ 30).

Based on Hartgrove's various certifications that it would comply with federal and state regulations, Bellevue claims that when Hartgrove requested reimbursement for patients who were admitted beyond Hartgrove's authorized capacity, "Hartgrove knowingly submitted a false or fraudulent claim for that patient." *Id.* at 12 (¶ 50). Bellevue alleges that "[t]hese claims are false in that Hartgrove certified either explicitly or implicitly that it was in compliance with all licensing standards contained in state law, rules, or regulations," even though it was allegedly in violation of 77 Ill. Admin. Code § 250.230(b) when Hartgrove was over census. *Id.* at 13 (¶ 50). Bellevue alleges that Hartgrove has "submitted false and/or fraudulent claim[s] from August 2001 to present." *Id.* at 16 (¶ 65).

Bellevue alleges that he "voluntarily provided the information [on which the allegations are based] to the [federal and state] Governments before filing this action." *Id.* at 3 (¶ 11). Bellevue also attached to his brief in opposition to Hartgrove's motion a letter from Bellevue's counsel to the United States Attorney's Office in Chicago and the Illinois Attorney General's Office, dated August 4, 2011, stating:

> Enclosed please find a copy of a disclosure statement, without exhibits, and a complaint which I intend on filing

> on behalf of George Bellevue in the United States District
> Court, Northern District of Illinois, alleging violations of
> the Federal and State False Claims Act.

R. 41-8. Bellevue did not attach the referenced "disclosure statement" to his complaint or brief, but in his brief, Bellevue contends that the "disclosure statements . . . outline[d] the fraud in detail." R. 41 at 7.

Bellevue filed this complaint under seal on August 5, 2011. *See* R. 1. The United States and the State of Illinois declined to intervene in the case, and Chief Judge Castillo entered an order on September 30, 2014 unsealing the complaint. *See* R. 17.

## Analysis

As an initial matter, Hartgrove argues that any of Bellevue's allegations based on claims Hartgrove allegedly submitted prior to August 5, 2005 must be dismissed because the FCA has a six-year statute of limitations. R. 39 at 20; *see* 31 U.S.C. § 3731(b)(1) ("A civil action under section 3730 may not be brought more than 6 years after the date on which the violation of section 3729 is committed . . . ."); *see also* 740 ILCS 175/5(b). Bellevue does not respond to this argument. Accordingly, Bellevue's action is limited to the allegation that false claims were submitted on August 5, 2005 or later.

Additionally, Bellevue includes himself in his individual capacity as a plaintiff in this case. Hartgrove argues that Bellevue "has not alleged any injury to himself that would support Article III standing, nor has [Bellevue] identified a cause of action that would allow him to sue Hartgrove over the conduct that is the

subject of this case." R. 39 at 20. Bellevue does not respond to this argument either. Hartgrove is correct that 31 U.S.C. § 3730(b)(1) creates rights of action only for the Attorney General and "private persons" whose "action[s] shall be brought in the name of the Government." *See also* 740 ILCS 175/4(b)(1) ("The action shall be brought in the name of the State."). Accordingly, Bellevue's claims in his individual capacity are dismissed.

With respect to the rest of Bellevue's claims, Hartgrove primarily argues that those claims should be dismissed for the following reasons: (1) Bellevue's allegations were publicly disclosed prior to his disclosure letter or complaint; (2) Bellevue is not an original source; (3) Bellevue has failed to state a valid theory of liability; and (4) even if Bellevue's theory of liability is valid, he has failed to plead it with particularity sufficient to satisfy Federal Rule of Civil Procedure 9(b).

## I.  Public Disclosure Bar

The FCA permits private citizens, known as "relators," to file a civil action on behalf of the government to recover money that the government paid on account of false or fraudulent claims. 31 U.S.C. § 3730(b)(1). These actions are referred to as *qui tam* actions. *See United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011).[1] "To establish civil liability under the [FCA], a relator

---

[1] The statutory language and standards for the FCA and the IFCA are substantially the same. *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 704 n.5 (7th Cir. 2014) ("the [IFCA] closely mirrors the FCA"); *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1163 n.2 (N.D. Ill. 2007) ("Case law regarding the FCA is also applicable to the [IFCA]."). Accordingly, the Court's analysis of the federal statute applies equally to Bellevue's claims under the state statute.

generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Yannacopoulos*, 652 F.3d at 822.[2]

## A.     Public Disclosure

Hartgrove argues that Bellevue's claims must be dismissed because they are subject to the "public disclosure bar." *See United States ex rel. Heath v. Wis. Bell, Inc.*, 760 F.3d 688, 690 (7th Cir. 2014). "Public disclosure" bars FCA actions, because "[w]here a public disclosure has occurred, [the relevant governmental] authority is already in a position to vindicate society's interests, and a qui tam action would serve no purpose." *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003).

Prior to statutory amendments that apply to claims arising after March 23, 2010, *see United States ex rel. Cause of Action v. Chi. Trans. Auth.*, 2014 WL 5333399, at *2 n.2 (N.D. Ill. Oct. 20, 2014), the FCA stripped courts of jurisdiction over:

> an action . . . based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media . . . .

---

[2] Specifically, these statutes prohibit "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment," and "knowingly mak[ing] or us[ing] . . . a false record or statement material to a false or fraudulent claim" paid by the government. *See* 31 U.S.C. §§ 3729(a)(1)(A), (B); 740 ILCS 175/3(a)(1)(A), (B).

31 U.S.C. 3730(e)(4)(A) (1986). By contrast, under the current version of the FCA, a public disclosure has been made if:

> substantially the same allegations or transactions as alleged in the action were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media . . . .

31 U.S.C. § 3730(e)(4)(A) (2010). For purposes of determining whether the public disclosure bar applies, however, this difference is immaterial because the Seventh Circuit has interpreted the pre-amendment language to conform to the statute's current language. *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 910 (7th Cir. 2009) (interpreting the old statute to prohibit actions in which the "complaint describes allegations or transactions that are *substantially similar* to those already in the public domain") (emphasis added). Thus, although Bellevue's claims accruing before March 23, 2010 are governed by the old statute, the public disclosure bar analysis is the same for all of his claims.

To determine whether a plaintiff has demonstrated that his allegations are not "substantially the same" as publicly disclosed information, a court must engage in a comparison of the previously publicly disclosed information and the plaintiff's allegations. *See Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 829 (7th Cir. 2013). The plaintiff bears the burden of establishing the inapplicability of the public disclosure bar. *See Glaser*, 570 F.3d at 913. To demonstrate that his allegations are not "substantially the same" as publicly disclosed allegations, a plaintiff must do

more than "add[] extra details" or "additional instances" of false claims. *See Heath*, 760 F.3d at 691. Some of the factors used to determine whether a relator's allegations are substantially similar to those already publicly disclosed are: (1) whether the time periods for the allegations or transactions overlap; (2) whether the relator has first-hand knowledge of the allegations; (3) whether the allegations are similar or involve different schemes such that independent investigation and analysis was required; and (4) whether the relator presents genuinely new and material information than that previously disclosed. *See Leveski*, 719 F.3d at 829-33; *Heath*, 760 F.3d at 691-92.

Additionally, the public disclosure bar applies "*only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves are the subject of a governmental civil action or penalty proceeding or have already been publicly disclosed." *Absher*, 764 F.3d at 708 (emphasis in original). "If an allegation of fraud has already been made, the analysis is straightforward. But even if no allegation of fraud has been made, the [public disclosure bar] may still apply so long as facts disclosing the fraud itself are in the government's possession or the public domain." *Id*. In determining whether the "facts disclosing the fraud" are public, "the court must determine whether facts establishing the essential elements of fraud—and, consequently, providing a basis for the inference that fraud has been committed—are in the government's possession or the public domain." *Id*.

### 1. Allegations Regarding Hartgrove's Conduct Prior to May 5, 2009

Hartgrove argues that Bellevue's allegations were publicly disclosed by the audit referred to in the letters the Illinois Department of Public Health sent to Hartgrove on March 23, 2009, and May 5, 2009. *See* R. 39-3; R. 39-4.[3] Bellevue argues, to the contrary, that these letters and the audit "simply state that the hospital was over census which is not enough for a reader to infer that a fraud had been committed." R. 41 at 7.

Bellevue cites the Seventh Circuit's reasoning in *Absher* in support of his argument that the letters from the Illinois Department of Public Health do not disclose the "critical elements" of "fraud." R. 41 at 5. In *Absher* the defendant nursing home was accused of failing to meet the statutorily mandated standard of care with respect to its residents' hygiene, pressure sore management, instances of scabies, and infection control. 764 F.3d at 708. The Seventh Circuit held that even though government survey reports disclosed the defendant's "provision of non-compliant care . . . . the surveys did not disclose facts establishing [the defendant] misrepresented the standard of care in submitting claims for payment to the government." *Id.* at 708-09. The court held that it "is not enough" that "as soon as

---

[3] The Court considers these documents even though they are outside the complaint because Hartgrove's motion is a factual challenge to the Court's subject matter jurisdiction over Bellevue's claims that are governed by the FCA's provisions as they were prior to the 2010 amendments. *See* 31 U.S.C. 3730(e)(4)(A) (1986) ("No court shall have jurisdiction over an action . . . ."). When considering a factual challenge to the court's jurisdiction, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers*, 536 F.3d at 656-57.

the government learned that [the defendant] was providing non-compliant care, it necessarily knew that at least some of [the defendant's] claims for payment were for the provision of non-compliant care." *Id.* at n.10. Rather, the "government must also have access to facts disclosing that [the defendant] had the *scienter* required by the FCA." *Id.* (emphasis added). Bellevue contends that, like the surveys disclosing "non-compliant care" in *Absher*, the letters from the Illinois Department of Public Health noting that Hartgrove had more patients than authorized are "not enough" to show public disclosure "because [they do] not disclose facts of misrepresentation in submitting claims for payment to the government." R. 41 at 6.

As Hartgrove notes, whether the letters from the Illinois Department of Public Health "disclose facts of misrepresentation," as Bellevue puts it, is really a question of whether the information in the letters is a sufficient basis to infer the scienter element of a FCA violation—i.e., "knowingly" seeking payment on a false basis. In *Absher*, the Seventh Circuit found that the government's knowledge that the defendant had on certain occasions not complied with the standard of care did not necessarily constitute knowledge that the defendant had knowingly misrepresented its compliance with the standard of care when requesting payments from the government. 764 F.3d at 709 n.10. This is because determining whether a standard of patient care has been violated involves a qualitative judgment. Although the Seventh Circuit did not explain its reasoning in such detail, the mere fact that the standard of care had been violated did not necessarily mean that the defendant knew a statutory or regulatory violation had occurred when the

defendant sought payment from the government for the care. In other words, the defendant in *Absher* could have mistakenly believed it was in compliance with the standard of care when it sought payment, and then later been found to have violated the standard of care through negligent (or perhaps reckless) conduct. In such circumstances, the mere fact of a regulatory violation does not necessarily imply the presence of the scienter required by the FCA, and thus, public disclosure of a regulatory violation, by itself, does not necessarily bar a claim under the FCA based on that violation.

Here, by contrast, Bellevue's theory of fraud is that there can be no question that Hartgrove knew that it had too many patients when it sought payment from the government, because no qualitative judgment is involved in determining whether the regulation limiting the number of patients has occurred. In other words, Bellevue's allegations amount to the theory that since the regulation at issue permits only a binary option—i.e., either Hartgrove admitted an unauthorized number of patients or it did not—there can be no question that Hartgrove acted knowingly when it sought payment from the government for patients above its authorized maximum. Bellevue must make this inference to allege fraud because he has not alleged that he has personal knowledge of Hartgrove's billing practices, so he has no direct knowledge of Hartgrove's scienter. But this inference works against Bellevue with respect to analyzing whether his allegations have already been publicly disclosed. For if Bellevue can infer scienter from Hartgrove's receipt of payment when it was over census, so can the government. Since the government

could have made the same inference based on its audit that Bellevue makes based on his personal observations, the "critical elements" of "fraud" were not missing from the government's audit and letters as Bellevue contends. Thus, Bellevue's allegations are "substantially the same" as the information in the March 23 and May 5, 2009 letters, and the letters constitute a prior public disclosure of Bellevue's allegations concerning that time period. As a result, Bellevue's claims based on allegations of Hartgrove's conduct through May 5, 2009, can only proceed if Bellevue is an "original source" of those allegations.

### 2. Allegations Regarding Hartgrove's Conduct After May 5, 2009

Before proceeding to analyze whether Bellevue is an original source of his allegations concerning Hartgrove's conduct through May 5, 2009, the Court addresses whether Bellevue's allegations subsequent to the time period referenced by the March 23 and May 5, 2009 letters were publicly disclosed. While it is reasonable to infer based on the letters that the government was aware of any payments it made for patients admitted beyond Hartgrove's authorized capacity prior to May 5, 2009, Hartgrove has not argued—let alone provided any evidence demonstrating—that the government is aware that Hartgrove has continued to engage in this practice, as Bellevue alleges. The Seventh Circuit has held that allegations of fraud beyond the "time period" of which the government is already aware can demonstrate that the allegations are not "substantially the same" as publicly disclosed allegations. *See Leveski*, 719 F.3d at 829. Hartgrove argues that Bellevue has "merely alleg[ed] 'particular allegations of fraud that [were] not

16

mentioned' in a prior public disclosure," which the Seventh Circuit found "'[was] not enough to take [the] case outside the jurisdictional bar' because the allegations 'pertain[ed] to the same entity and described the same fraudulent conduct.'" R. 41 at 7 (quoting Glaser, 570 F.3d at 920). But in *Glaser*, the relator's allegations were about the same time period of which the government was already aware. 570 F.3d at 911-12. By contrast, Bellevue has made allegations of conduct that occurred after the time period reference in the March 23 and May 5 letters. Thus, Bellevue's allegations of fraud after May 5, 2009 are not "substantially the same" as the information that has already been publicly disclosed in the March 23 and May 5, 2009 letters. Therefore, these claims are not barred by the public disclosure doctrine.

### B. Original Source

Despite his allegations regarding Hartgrove's conduct prior to May 5, 2009 being based upon publicly disclosed information, Bellevue's claims regarding that conduct may proceed if he can establish that he is an "original source" of that information. *See* 31 U.S.C. § 3730(e)(4)(A). Prior to the 2010 amendments, "original source" was defined as:

> an individual who has direct and independent knowledge of the information on which the allegation are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B) (1986). "Direct" knowledge is that which is "based on [a relator's] own investigative efforts and *not* derived from the knowledge of others."

*Glaser*, 570 F.3d at 917 (emphasis in original). For a relator to establish that it has "independent" knowledge, the relator must be "someone who would have learned of the allegation or transactions independently of the public disclosure." *Id*. at 921. If the information in question has already been publicly disclosed, "[t]he question is whether the relator is an original source of the allegations in the complaint and not . . . whether the relator is the source of the information in the published reports." *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 869 (7th Cir. 2011).

### 1.    Disclosing Information to the Government

As an initial matter, to be an original source Bellevue must have "voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (1986). Hartgrove argues that Bellevue has failed to plead that he has met "his burden to plead what he disclosed," R. 42 at 10, in that he only pled that he provided the government with "substantially all material evidence and information he possess[es]," R. 1-1 at 3-4 (¶ 12), without attaching or describing that evidence and information. But Bellevue has attached a letter addressed to both the United States Attorney's Office in Chicago and the Illinois Attorney General's Office, stating that he provided them with a copy of the complaint he filed the next day to initiate this case. *See* R. 41-8.[4] The complaint contains all the evidence and information Bellevue has—i.e., his personal knowledge that Hartgrove is sometimes "over census," including 13 specific examples of when this occurred. The Court finds

---

[4] The Court considers this letter even though it was not attached to or referenced by the complaint, because it is relevant to the Court's subject matter jurisdiction, for the same reasons discussed with reference to the letters Hartgrove received from the Illinois Department of Public Health.

Bellevue's allegations and the attached letter sufficient to meet his burden to show that he disclosed the information he had to the government prior to filing this action.

## 2. Direct and Independent Knowledge

Bellevue argues that he "has direct and independent knowledge of the information" in his complaint in that as "an employee of [Hartgrove] [he] personally observed and recorded, [Hartgrove] being over census, children who were Medicaid beneficiaries sleeping in the dayroom, and rollaway beds being stored in a closet." R. 41 at 7. Hartgrove cites the Seventh Circuit's decision in *Glaser*, 570 F.3d at 921, and argues that Bellevue has failed to plead that he is an original source because he "has pled no facts, let alone direct and independent knowledge, of any fraudulent *billing* related to those patients." R. 39 at 9 (emphasis in original).

In *Glaser*, the plaintiff was treated a number of times at a clinic that billed its services to Medicaid. 570 F.3d at 911. The plaintiff alleged that she was always treated by a physician's assistant, but the clinic billed Medicaid at a doctor's rate. *Id.* The Seventh Circuit held that the plaintiff had failed to allege that she had "direct" knowledge of the basis for her claim because "the only knowledge [the plaintiff] has of [the defendant's] billing practices comes from her attorney." *Id.* at 921. Moreover, the court rejected the plaintiff's argument that the treatment she received from the defendant gave her direct knowledge sufficient to support her claim. The court reasoned that "the fraud alleged pertains to the billing, not the treatment." *Id.*

It is true that Bellevue does not allege that he has any direct knowledge of Hartgrove's bills or billing practices. But the Seventh Circuit's reasoning in *Glaser* does not destroy Bellevue's ability to allege that Hartgrove fraudulently sought payment from the government. The Seventh Circuit has also held that "knowledge obtained through an *investigation* can be the basis for a qui tam action." *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999) (emphasis added). The relator in *Lamers* alleged that the defendant municipal bus company was operating in violation of federal regulations that were conditions of federal funding. The relator did not work for the defendant municipal bus company, but "he had direct and independent knowledge derived from 'walk[ing] the streets of Green Bay observing the buses in action.'" *Leveski*, 719 F.3d at 838 (quoting *Lamers*, 168 F.3d at 1017). "It was unnecessary for [the relator in *Lamers*] to prove his personal knowledge that [the defendant] had fraudulently certified its compliance with [the] regulations [at issue] at the outset of his suit," because "[c]learly, [the defendant] was certifying that it was in compliance since it was still receiving [federal] funding—which meant that if [the relator's] allegation were true, [the defendant] was falsely certifying it was in compliance." *Leveski*, 719 F.3d at 838; *see also United State ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) (engineer involved in building engines for the Air Force was permitted to allege false billing because he knew the engines were not built to Air Force specifications and the builder received payment from the Air Force anyway). The Seventh Circuit reasoned that since it is "unlikely" for a relator to have actual

20

documentation of false billing "'unless he works in the defendant's accounting department,'" relators must be permitted to allege false billing through an inference like those in *Lamers* and *Lusby*, because "holding otherwise would have 'take[n] a big bite out of qui tam litigation.'" *Leveski*, 719 F.3d at 839 (quoting *Lusby*, 570 F.3d at 854).[5]

As the Court reasoned above with respect to the public disclosure analysis, the alleged binary nature of Hartgrove's regulatory violation leads to the inference that Hartgrove acted knowingly when it falsely certified that it did not exceed its authorized number of patients. The Seventh Circuit cases discussed above show that it has applied similar reasoning to the original source analysis. Thus, Bellevue's failure to directly allege fraudulent billing does not mean that he cannot be an original source.

### 3. Material Addition

Hartgrove also argues that Bellevue is not an original source because his allegations are not "qualitatively different information than what had already been discovered," and are "merely the product and outgrowth of publicly disclosed information." R. 42 at 8 (citing *United States ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 443 (5th Cir. 2008)). Hartgrove acknowledges that "the Seventh Circuit has not explicitly adopted the [Fifth Circuit's] requirement that the

---

[5] *See also Lamers*, 168 F.3d at 1018 ("In our case, we think it's clear that [the relator] provided a service to the [City agency] by keeping an eye on how the City's practices matched up to its statements. He may be viewed by some as a bit of a busybody with his own agenda, but he is certainly not a parasite. And to a certain degree, Congress wanted to encourage busybodies who, through independent efforts, assist the government in ferreting out fraud.").

Relator's knowledge be qualitatively different." R. 42 at 8. Hartgrove contends, however, that three Seventh Circuit cases—*Lamers*, *Leveski*, and *Glaser*—exemplify the Seventh Circuit's application of this principle in practice, because in those cases the court found relators to be original sources when they either disclosed their information to the government prior to any public disclosure, or disclosed information to the government that was uniquely in their possession. *See* R. 42 at 8-9.

The cases Hartgrove relies on are inapposite because in those cases the court found that either the relator's allegations were not publicly disclosed or that the relator had disclosed information to the government prior to any public disclosure. By contrast, the question here is what Bellevue has to allege to be an original source even though his allegations have already been publicly disclosed. When the Seventh Circuit has addressed allegations like Bellevue's—allegations that were publicly disclosed apart from relator's disclosure—the Seventh Circuit has rejected the kind of qualitative comparison of a relator's allegation to publicly disclosed information required by the Fifth Circuit. In *Leveski*, the Seventh Circuit held that it is not "appropriate to ask whether [a relator] was the first person to bring [the alleged violations] to the public's attention. Rather, it is appropriate to ask whether [the relator] is the original source of the specific allegations *in her complaint*." 719 F.3d at 836 (emphasis added). This standard acknowledges that relator allegations that are already publicly disclosed are necessarily "substantially similar" to the publicly disclosed information; otherwise there would not have been a basis for a

court finding that the allegations were already publicly disclosed, and the original source analysis would be superfluous. Requiring a relator to disclose allegations that are "qualitatively different" from information in the public record would all but disqualify people who "learned of the [same] allegation or transactions independently of the public disclosure" from being an original source. *Glaser*, 570 F.3d at 921 (quoting *United States v. Bank of Farmington*, 166 F.3d 853, 865 (7th Cir. 1999)). But the Seventh Circuit has emphasized that the appropriate question is how the relator learned about his own allegations, not whether his allegations overlap with previously disclosed information. Since it is reasonable to infer that Bellevue has personal knowledge of occasions when Hartgrove has been over census based on Bellevue's employment with Hartgrove, the Court finds that Bellevue is an original source for his allegations of Hartgrove's fraud prior to March 23, 2010.[6]

Therefore, none of Bellevue's claims are barred by the public disclosure doctrine.

## II.    Failure to State a Claim Under the False Claims Act

### A.    Theory of Fraud

In addition to Hartgrove's argument that Bellevue's claims are barred by public disclosure, Hartgrove contends that Bellevue's "allegations fail to state an FCA claim as a matter of law." R. 39 at 10. As the Court noted earlier, "[t]o establish civil liability under the [FCA], a relator generally must prove (1) that the

---

[6] The Court has already held that Bellevue's allegations of fraud occurring after May 5, 2009 are not "substantially the same" as allegations that have been publicly disclosed, so the Court does not have to apply the amended definition of "original source" in this case.

defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Yannacopoulos*, 652 F.3d at 822. Bellevue argues that two separate theories of liability satisfy these elements: (1) Hartgrove "submitted false per diem claims to Medicaid," R. 41 at 9; and (2) Hartgrove's "false certification and licensing violations create false claims," *id.*

### 1. Worthless Services Claim

Bellevue argues that "[w]hen [Hartgrove] admitted a patient and placed that patient into a dayroom, [as] opposed to a patient room, because the hospital . . . was over capacity, and [Hartgrove] submitted a per diem claim for that patient, that claim was false," because "a patient room is required [and] essential to treatment." R. 41 at 9. In opposition, Hartgrove contends this claim is a "diminished value theory of false claims" that the "Seventh Circuit rejected" in *Absher*. R. 42 at 11.

As already noted, in *Absher* the defendant nursing home was accused of failing to meet the statutorily mandated standard of care for its residents. 764 F.3d at 704-05. Besides engaging in the public disclosure analysis reviewed above, the Seventh Circuit also held that the plaintiff had failed to "establish[] that [the defendant's] services were truly or effectively 'worthless,'" and "any such claim would be absurd in light of the undisputed fact that [the defendant] was allowed to continue operating and rendering services of some value despite regular visits by government surveyors. . . . [who] would certainly have noticed if [the defendant] was providing no or effectively no care to its residents." *Id.* at 710. "It is not enough to

offer evidence that the defendant provided services that are worth some amount less than the services paid for." *Id.* "That is, a 'diminished value' of services theory does not satisfy this standard." *Id.*

Bellevue has alleged an analogous claim. Bellevue has not alleged that patients who slept on cots in the dayroom did not receive any treatment. Rather, he alleges that they did not receive the one particular service of an individual room. Certainly the regulations recognize that it is better to have a room of one's own. *See* 77 Ill. Admin. Code § 250.230(b). But absent an allegation that the failure to provide a room destroyed the effectiveness of the rest of the treatment provided, Bellevue's allegation that certain patients were deprived of this particular aspect of the services to which they were entitled cannot serve as the basis for an FCA claim. Thus, even if Bellevue's allegations that Hartgrove falsely certified that it provided rooms for patients when it did not are true, such facts do not establish liability under the FCA.

Bellevue's only argument in support of this theory of liability is that an individual room is "essential" to the treatment Hartgrove provides to it patients. He implies that failure to provide such a room constitutes a complete abdication of Hartgrove's obligation to treat its patients. Yet, Bellevue only makes this argument in summary fashion in his brief and does not make any such allegations in his complaint. Bellevue does not explain—either in his complaint or brief—why a room is so essential to treatment. Bellevue alleges that the patients affected by Hartgrove's alleged failure to provide rooms suffered from "acute mental illness." It

is not plausible to believe that the room Hartgrove is supposed to provide to such patients is more "essential" than the therapy they also receive. Bellevue himself is a therapeutic counselor. As such, he is in prime position to know whether Hartgrove's failure to provide rooms to certain patients has affected their treatment or prognosis. Yet he makes no such allegations. There are no allegations explaining why the deprivation of a room is so detrimental to a patient's treatment that a claim for services provided to a patient should be considered false. There are also no allegations that any of the patients placed in the dayroom was left there for an extended period of time. In fact, Bellevue's allegations indicate that this was always a short-term arrangement. *See* R. 1-1 at 12 (¶ 47) ("May of these patients are then placed back into a dayroom until a patient room becomes available."); *id.* at 12-23 (¶ 50) ("Hartgrove knowingly submitted a false or fraudulent claim for that patient whether or not the patient was given a room *prior to the midnight census*.") (emphasis added).[7] The Court cannot reasonably infer that Hartgrove's services were worthless, making that theory of liability unavailable to support Bellevue's claims.

### 2.    False Certification Claim

Bellevue's alternative theory of liability is that Hartgrove falsely certified that it was in compliance with 77 Ill. Admin. Code § 250.230(b), which requires that a hospital shall ensure that its "occupancy does not at any time exceed capacity, except in the event of unusual emergency and then only as a temporary measure."

---

[7] In only one instance does Bellevue allege that a patient was housed in the dayroom for "several days." R. 1-1 at 15 (¶ 60).

The problem with this argument is that "[v]iolating a regulation is not synonymous with filing a false claim." *United States ex rel. Grenadyor v. Ukranian Vill. Pharmacy Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014). For violating a regulation to imply false certification, the regulation violated must be a "condition[] of, or prerequisite[] to, government payment." *Absher*, 764 F.3d at 710; *see also United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005) ("An FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements also requires that the certification of compliance be a condition of or prerequisite to government payment.").

Here, Bellevue does not allege that 77 Ill. Admin Code § 250.230(b) is a condition of payment. Nor could he as there is no language in 77 Ill. Admin Code § 250.230(b) indicating that it is a condition of payment. Instead, Bellevue alleges that the documents that Hartgrove signed certifying that it was in compliance with licensing standards were conditions of payment. Despite these allegations, however, Bellevue does not allege that Hartgrove signed and submitted any of these documents in connection with obtaining any particular payment. *See Gross*, 415 F.3d at 604 (The FCA "requires that the fraudulent statement's purpose must be to coax payment of money from the government."); *cf. Absher*, 764 F.3d at 703, 713 ("To receive reimbursement, [the defendant] was required to provide government regulators with a completed [MDS] form on behalf of each resident. The form is . . . a billing document . . . . [A] reasonable jury could certainly find that these MDS forms were conditions of payment because they specifically affirm that

reimbursement is 'conditioned on the accuracy and truthfulness of [the] information contained in the forms.'"). Absent such a connection, the certification documents Bellevue identifies in his complaint cannot support an FCA claim.

Furthermore, the certification documents Bellevue cites demonstrate that their purpose is to establish or maintain Hartgrove's status as a participating Medicaid provider, and not part of the process for obtaining reimbursement for services provided to particular patients. *See* R. 1-1 at 22-23, 41-42. To the extent that these documents reference the process for billing and receiving reimbursement, they do so only generally and prospectively. Such prospective certification can only establish an FCA claim under a theory of fraudulent inducement where the plaintiff alleges that the defendant never intended to comply with the conditions of participation. *See United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("[F]raud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do."); *see also United States ex rel. Upton v. Family Health Network, Inc.*, 900 F. Supp. 2d 821, 834 (N.D. Ill. Oct. 1, 2012) ("Relators' argument fails, however, because alleging that the claims are 'conditions of participation' is only sufficient if the plaintiff asserts liability on the fraudulent inducement theory, which Relators have not done."). Absent an allegation that Hartgrove *intended* to violate 77 Ill. Admin Code § 250.230(b) at the time it signed the certification documents Bellevue cites, Hartgrove's failure to comply with § 250.230(b) cannot serve as the basis for an FCA claim, even if it is true that Hartgrove knew it had

not complied with § 250.230(b) when it requested such reimbursement. Bellevue has made no such allegation of intent contemporaneous with Hartgrove signing the certification documents. Therefore, Bellevue's claims are dismissed because he has failed to allege a viable theory of liability under the FCA.

## B. Allegations of Fraud

In case Bellevue should decide to replead his claims with a different theory of liability, the Court addresses the application of Federal Rule of Civil Procedure 9(b) to his complaint. Hartgrove argues that Bellevue has "fail[ed] to plead any facts about the "who, what, when, where, and how' of the alleged scheme, most notably who at Hartgrove submitted a misrepresentation in a claim for payment, when that misrepresentation was made, what was the content of that misrepresentation, or how the misrepresentation was revealed to [Bellevue]." R. 39 at 18-19.

Hartgrove is correct that Bellevue does not allege these facts. But Bellevue does not work in a position at Hartgrove that would give him access to such particularized information. Plaintiffs who have limited information like Bellevue are permitted to allege fraud based upon "information and belief" when "(1) the facts constituting the fraud are not accessible to the plaintiff[,] and (2) the plaintiff provides the grounds for his suspicions." *See Pirelli Armstrong Tire Corp., Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). The Seventh Circuit has held that a relator who does not have personal knowledge of particularized facts about the alleged fraud can nonetheless comply with Rule 9(b) if the relator has sufficient circumstantial evidence of the fraud. *See Lusby*, 570 F.3d

at 854-55 ("We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit. True, it is essential to show a false statement. But much knowledge is inferential . . . . It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy."). Thus, if Bellevue can allege a viable theory of liability (which he has not done in his current complaint), his inability to provide details of the billing would not necessarily doom his amended complaint.

Nevertheless, "even as courts remain sensitive to information asymmetries that may present a plaintiff from offering more detail," the "grounds for the plaintiff's suspicions must make the allegations plausible." *Pirelli Armstrong Tire*, 631 F.3d at 443. Even though Bellevue does not have to allege billing details to the extent Hartgrove contends, Bellevue's allegations are insufficient in a more prosaic aspect. Bellevue alleges that Hartgrove falsely certified that it was in compliance with 77 Ill. Admin. Code § 250.230(b) on the basis that Hartgrove continued to receive Medicaid reimbursements even though it was over census on a number of occasions. The regulation, however, does not simply prohibit hospitals like Hartgrove from being over census. Rather, § 250.230(b) requires that a hospital shall ensure that its "occupancy does not at any time exceed capacity, *except in the event of unusual emergency* and then only as a temporary measure." (emphasis added). Bellevue ignores the provision that permits a hospital to be over census "in the event of unusual emergency." Absent allegations that Hartgrove was not over

census due to an "unusual emergency," Bellevue has failed to allege that Hartgrove violated the regulation at the heart of his claims. This is also a sufficient basis to dismiss Bellevue's claims.

## Conclusion

For the foregoing reasons, Hartgrove's motion, R. 30, is granted, and Bellevue's complaint is dismissed without prejudice. Bellevue is granted leave to replead his claims with a viable theory of liability by May 27, 2015.[8]

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: April 24, 2015

---

[8] Hartgrove asks the Court to dismiss Bellevue's claims with prejudice because both of Bellevue's theories of liability fail as a matter of law. Nevertheless, the Court cannot say with certainty that Bellevue does not possess additional facts which may allow him to allege a different theory of liability than those the Court has rejected. Thus, the Court grants Bellevue leave to amend his complaint, because it is not necessarily futile for Bellevue to do so.